Douchan WEILEY, Appellant

v.

ALBERT EINSTEIN MEDICAL CENTER and Temple University School of Medicine and Hancock Funeral Home, Ltd., and John Doe, Appellees.

Superior Court of Pennsylvania.

Argued Feb. 14, 2012.

Filed May 24, 2012.

---

1. Appellate review of a PCRA court's decision is limited to examining whether the PCRA court's findings of fact are supported by the record and whether its conclusions of law are free from legal error. *Commonwealth v. Colavita,* 606 Pa. 1, 993 A.2d 874, 886 (Pa.2010).

Brian O. Phillips, Doylestown, for appellant.

Claire Neiger, Philadelphia, for Albert Einstein Medical Center, appellee.

Joshua Knepp, Philadelphia, for Temple University School of Medicine, appellee.

BEFORE: BENDER, J., OTT, J., and FITZGERALD, J.[*]

OPINION BY BENDER, J.

Douchan Weiley ("Weiley") timely appeals from the order of the trial court, entered December 17, 2010, which dismissed his complaint after sustaining all the preliminary objections of the defendants, Albert Einstein Medical Center ("Hospital"), Temple University School of Medicine ("School"), John Doe, an unknown person at School, and Hancock Funeral Home, Ltd. ("Funeral Home"). We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

On October 22, 2010, Weiley filed a complaint against the above-noted defendants for the alleged mishandling and mistreatment of the body of his father, Elmer Weiley. In the complaint, Weiley avers that, on January 12, 2009, his father presented to Hospital's emergency room with a myocardial infarction. Complaint, 10/22/10, at ¶ 13. Hospital admitted his father for treatment. *Id.* at ¶ 14. Hospital's progress notes from that same date indicate that Weiley was a point of contact and next-of-kin for his father. *Id.* at ¶ 15. Weiley and other family members visited his father on multiple dates while his father was admitted at Hospital, from January 12, 2009 until January 23, 2009. *Id.* at ¶¶ 16–18. Weiley met and spoke with Hospital personnel concerning his father's "prognosis and/or treatment." *Id.* at ¶ 19. On January 17, 2009, as a surrogate for his

[*] Former Justice specially assigned to the Superior Court.

father, Weiley signed a Statement of Do Not Resuscitate ("DNR"). *Id.* at ¶ 20.

"Agents, workers, officers, and/or employees of [Hospital] asked [Weiley] and [Weiley's] family members about organ donation concerning" Weiley's father. *Id.* at ¶ 24. Weiley avers that "on multiple occasions" he and his family informed these Hospital personnel that "they did not want [Weiley's father's] organs and/or tissue harvested for donation, or his body used for medical experiments." *Id.* at ¶ 25. Weiley also spoke with Hospital's social worker on January 19, 2009, regarding local funerary services. *Id.* at ¶ 23. The progress notes attached to Weiley's complaint reveal that Hospital was in communication with family on multiple occasions throughout Weiley's father's stay for discussions about, for example, Weiley's father's poor prognosis and palliative care, prayer and counseling with a chaplain, and meetings with physicians. The notes also reveal, for example, that Weiley was "visibly upset/tearful" regarding his father's condition. *See* Progress Notes, 1/12/09 (Chaplain's note, attached to Complaint as Exh. A; RR at 97).

Weiley's father died at Hospital on the morning of January 23, 2009. Complaint at ¶ 21. On that same date, "an agent, worker, officer, and/or employee of [Hospital] called [Weiley] to give notice" of his father's death. *Id.* at ¶ 26. The progress notes from that date support this averment. At a time contemporaneous with decedent's death, the notes indicate that Hospital tried "many times to contact family but no answer. Left message. . . ." *See* Progress Notes, 1/23/09 at 5:3[0] a.m. (Attached to Complaint as Exh. A; RR at 96). Another note, made at 5:38 a.m. by a different person indicates, "[t]ried to contact family . . . Left message × 2" indicating that two messages were left at that time. *See* Progress Notes, 1/23/09 at 5:38 a.m. (RR at 103). Weiley avers that "[u]pon the death of [his father, Weiley and his] family members made arrangements with Philadelphia Crematories to have the body cremated." *Id.* at ¶ 27.[1]

The next averment in Weiley's complaint concerns a date four days after his father's death, on January 27, 2009, when Weiley contends that he received a call from Barbara Bernard, the head of Hospital's Social Services department, informing him that his father's body had been transferred, by Funeral Home, from Hospital to School "for holding". *Id.* at ¶¶ 28, 29. Weiley claims that neither he nor his family gave consent to Hospital for this transfer and that Hospital did not make a good-faith effort to contact him or his family before making this transfer. *Id.* at ¶¶ 30, 31. Prior to Ms. Bernard's call on January 27th, the only evidence of Hospital's attempt to contact Weiley (at least within the confines of Weiley's complaint and the attached exhibits, at this point in the litigation) is found in the progress notes at the time of his father's death, on January 23rd, as described above.

On January 27, 2009, following Ms. Bernard's call, Weiley contacted Funeral Home and confirmed that it had transferred his father's body from Hospital to School. *Id.* at ¶¶ 32, 33. On this same date, Weiley called School "concerning the body of his father, but received no information as to the whereabouts and/or status of the body." *Id.* ¶ 34.

Weiley "spent the next several days contacting defendant [School] in an attempt to locate the body of his father." *Id.* at ¶ 35.

---

1. The complaint does not, however, indicate how, or exactly when, Weiley discovered the news about his father's death.

Weiley "became distraught trying to locate the body of his father, while at the same time dealing with his grief from his father's death." *Id.* at ¶ 36.

On January 29, 2009, Weiley went to School to have his father's body released to Philadelphia Crematories Funeral Home. *Id.* at ¶ 37. "Upon release from [School], [Weiley's father's] body showed evidence that post-mortem operations had been performed[,]" *id.* at ¶ 41, including "disfiguring post-mortem scars to the face, head and body[,]" *id.* at ¶ 42, and "evidence that the brain had been removed and/or operated on[,]" *id.* at ¶ 43. Weiley and his family were forced to view the body in order to identify it, and thereupon "suffered mental and emotional distress through the atrocities inflicted on the body of his father." *Id.* at ¶ 45.

Based on the above factual averments, Weiley asserted the following causes of action against Hospital: tortious interference with a dead body, intentional infliction of emotional distress ("IIED"), and negligent infliction of emotional distress ("NIED"), with a claim for punitive damages. *Id.* at ¶¶ 22–60. Weiley asserted claims for tortious interference with a dead body, IIED, and punitive damages against School, John Doe, and Funeral Home. *Id.* at ¶¶ 61–113.

On November 8, 2010, Hospital and Funeral Home filed preliminary objections, and School did likewise on November 12, 2010. The trial court sustained all of the defendants' preliminary objections and dismissed the complaint. Weiley filed this timely appeal.

 Initially, we note the scope and standard of review applicable to this appeal:

A preliminary objection in the nature of a demurrer is properly granted where the contested pleading is legally insuffi-

cient. *Cardenas v. Schober,* 783 A.2d 317, 321 (Pa.Super.2001) (citing Pa. R.C.P. 1028(a)(4)). "Preliminary objections in the nature of a demurrer require the court to resolve the issues solely on the basis of the pleadings; no testimony or other evidence outside of the complaint may be considered to dispose of the legal issues presented by the demurrer." *Id.* at 321–22. (citation omitted). All material facts set forth in the pleading and all inferences reasonably deducible therefrom must be admitted as true. *Id.* at 321.

In determining whether the trial court properly sustained preliminary objections, the appellate court must examine the averments in the complaint, together with the documents and exhibits attached thereto, in order to evaluate the sufficiency of the facts averred. The impetus of our inquiry is to determine the legal sufficiency of the complaint and whether the pleading would permit recovery if ultimately proven. This Court will reverse the trial court's decision regarding preliminary objections only where there has been an error of law or abuse of discretion. When sustaining the trial court's ruling will result in the denial of claim or a dismissal of suit, preliminary objections will be sustained only where the case i[s] free and clear of doubt.

*Brosovic v. Nationwide Mutual Insurance Co.,* 841 A.2d 1071, 1073 (Pa.Super.2004) (citation omitted).

*Cooper v. Frankford Health Care Sys., Inc.,* 960 A.2d 134, 143–144 (Pa.Super.2008) (quoting *Hess v. Fox Rothschild, LLP,* 925 A.2d 798, 805–06 (Pa.Super.2007)). Thus, "the question presented by the demurrer is whether, on the facts averred, the law says with certainty that no recovery is possible. Where a doubt

exists as to whether a demurrer should be sustained, this doubt should be resolved in favor of overruling it." *Bilt–Rite Contractors, Inc. v. The Architectural Studio,* 581 Pa. 454, 866 A.2d 270, 274 (2005) (citation omitted).

We now turn to the legal sufficiency of the claims in Weiley's complaint.

### Tortious Interference with a Dead Body Against Hospital

Weiley argues that the trial court erred by concluding that he failed to assert sufficient facts to support his cause of action against Hospital for interference with a dead body. We agree.

Our Supreme Court officially recognized and applied the common law tort of interference with a dead body in the case of *Papieves v. Lawrence,* 437 Pa. 373, 263 A.2d 118 (1970). The grim circumstances of that case involved a youth who hit and killed another youth with a car, hid the body, and later buried it in a shallow grave with the assistance of his friend, where it was discovered two months later. The victim's parents asserted the tort of interference with a dead body against the driver and his friend, claiming only mental damages (*i.e.,* mental anguish, emotional disturbance, embarrassment, and humiliation). *Papieves,* 263 A.2d at 119. The *Papieves* Court noted, "the issue of recovery for emotional distress resulting from the mishandling of the body of a deceased relative has never before been presented to an appellate court in this Commonwealth." *Id.* at 120.

The *Papieves* Court adopted the definition of the tort of intentional interference with a dead body, as found in section 868 of the First Restatement of Torts:

> A person who wantonly mistreats the body of a dead person or who without privilege intentionally removes, withholds or operates upon the dead body is liable to the member of the family of such person who is entitled to the disposition of the body.

RESTATEMENT (FIRST) OF TORTS § 868 (1939); *Papieves,* 263 A.2d at 120, 121, 122. *See also Hackett v. United Airlines,* 364 Pa.Super. 612, 528 A.2d 971 (1987), *appeal denied,* 518 Pa. 649, 544 A.2d 961 (1988) (indicating that our Supreme Court expressly adopted this provision). A plain reading of section 868 reveals that a party can plead that the defendant acted with a wanton state of mind in the mistreatment of a body, as per the first portion of section 868, or that the defendant acted intentionally, without privilege, to remove, withhold or operate on the dead body, as per the second portion of section 868, or that the defendant acted with both states of mind.[2] In either event, the plaintiff must also establish that he or she is a family member of the decedent who is entitled to the disposition of the body.

In the instant case, the trial court applied an unduly strict level of specific intent not recognized in the *Papieves* case. It interpreted *Papieves* as follows: "The Court reasoned that the purpose of Section 868 is to protect decedent's relatives against intentional, outrageous or wanton conduct *calculated to incite* serious mental or emotional distress...." Trial Court Opinion (T.C.O.), 10/6/11, at 6 (emphasis supplied). Yet, the word "incite" is not found anywhere in the *Papieves* opinion.

2. Use of the word "or" is "disjunctive. It means one or the other of two or more alternatives." *In re Paulmier,* 594 Pa. 433, 937 A.2d 364, 373 (2007). The *Papieves* Court found that the facts pled by the plaintiffs in that case were sufficient to establish both wanton and intentional conduct, *Papieves,* 263 A.2d at 121 & 122, but it adopted and applied the disjunctive form of the rule, as per the text of the Restatement.

The court may have been referring to a portion of the *Papieves* opinion positing that the "real[ ] issue is the right of a decedent's nearest relatives to protection against intentional, outrageous or wanton conduct which is peculiarly calculated to cause them serious mental or emotional distress." *Papieves*, 263 A.2d at 121.[3] It appears that the trial court seized on this language to conclude that Weiley "fail[ed] to offer any facts that any procedures were performed intentionally or wantonly with the purpose of inciting serious emotional or mental distress." T.C.O. at 7. By applying this unduly strict standard, the trial court concluded erroneously that Weiley failed to state a cause of action against Hospital for interference with a dead body.

Essentially, the trial court would require Weiley to plead facts to establish that Hospital had the specific intent or desire to transfer the body or donate it for medical dissection to School for the purpose of causing Weiley to have serious mental distress. If we were to apply this narrow interpretation of the intent required for this tort to the facts in *Papieves*, the Court in that case would not have been able to reverse the trial court's dismissal of the complaint and remand for consideration of this tort, as it did.

For one, the *Papieves* Court recognized that the defendants in that case hid the body to cover up the fact that one of them killed the victim with a car, *see* 263 A.2d at 119, not that they engaged in this conduct to cause distress to the victim's parents. Additionally, the plaintiffs in *Papieves* pled that the defendants hid the body of their son with the intent of preventing the plaintiffs from discovering the fate of their son (not with the intent of causing the plaintiffs mental distress). If the *Papieves* Court found that the plaintiffs in that case did not have to plead that the tortfeasors acted with the specific intent to cause them serious mental distress to support this cause of action, it would surely not require Weiley to prove that Hospital purposefully intended to incite Weiley to suffer mental distress. Thus, the narrow view taken by the trial court in the instant case does not comport with what the *Papieves* Court required for the state of mind element in the tort of interference with a dead body.

This brings us to the question of what definition of intent the *Papieves* Court did apply. The *Papieves* Court used the phrase "peculiarly calculated" only once in its opinion, in its discussion of the law in other jurisdictions and what commentators in secondary legal sources have said about the elements of section 868. *Papieves*, 263 A.2d at 121. The phrase is used in referencing back to summations of law in other jurisdictions mentioned earlier in that same paragraph, *i.e.*, that the intentional or wanton act be "likely to cause severe emotional distress" or that it is "highly probable [the intentional or reckless act] will cause acute and poignant emotional distress". *Id.* at 120. The Court noted that conduct that fit the description of "intentional, reckless or wanton acts likely to cause severe emotional distress" included "unlawful interment or disinterment of a body, intentional interference with a bur-

---

**3.** The *Hackett* court also cites to the phrase "peculiarly calculated" (*see* 528 A.2d at 973), but it did not have the opportunity to determine what the *Papieves* Court meant by it, like we do here. Rather, the *Hackett* court was faced with a claim of negligent mishandling of a body, where the plaintiff did not aver intentional conduct. Accordingly, the *Hackett* court concluded that section 868, adopted by the *Papieves* Court, dealt only with an intentional tort, not a negligent tort—and it had no reason to go further to examine what the *Papieves* Court required to properly plead the state of mind element of the intentional tort of interference with a dead body.

ial, the wanton mutilation or unauthorized embalming of a corpse, and other intentional, reckless or wanton acts likely to cause severe emotional distress." *Id.*

■ References in *Papieves* to conduct that is "likely to cause" or has a high probability of causing serious mental distress comports with the definition of "intent" found in the Restatement (Second) of Torts: "The word 'intent' is used throughout the Restatement of this Subject to denote that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it." RESTATEMENT (SECOND) OF TORTS § 8A (1965).[4] In *Burr v. Adam Eidemiller, Inc.*, 386 Pa. 416, 126 A.2d 403, 407 (1956), our Supreme Court applied this definition of intent to conclude that the defendant tortfeasor intentionally polluted the plaintiff's land because it knew its operations were the cause of the pollution, yet continued its operations unabated despite this knowledge. This is the same definition applied in *Papieves*. Thus, we conclude that this definition of intent, for the purpose of the second portion of section 868, is met by showing either a desire to cause mental distress or a belief or knowledge that one's conduct is substantially certain to cause the plaintiff mental distress, as where "the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead" with the conduct

anyway. RESTATEMENT (SECOND) OF TORTS § 8A cmt. b.

Before we examine Weiley's complaint, we additionally recognize that a plaintiff can also plead that a tortfeasor wantonly mistreated the body, as per the first portion of section 868. Although the *Papieves* Court did not set forth a definition of wantonness, other case authority in Pennsylvania has:

> [W]antonness exists where the danger to the plaintiff, though realized, is so recklessly disregarded that, even though there be no actual intent, there is at least a willingness to inflict injury, a conscious indifference to the perpetration of the wrong.[ ] "Wanton misconduct means that 'the actor has intentionally done an act of an unreasonable character, in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow.' "

*Stubbs v. Frazer*, 308 Pa.Super. 257, 454 A.2d 119, 120 (1982) (citations omitted). The *Stubbs* court also recognized that it is generally up to a jury to decide if a defendant is "guilty of wanton misconduct under the circumstances," but the issue should not be submitted to a jury where the plaintiff failed to produce any evidence that the tortfeasor "acted in disregard to an existing peril." *Id.* at 121 (citations omitted).

---

4. A comment to this section provides further insight:

> b. All consequences which the actor desires to bring about are intended, as the word is used in this Restatement. Intent is not, however, limited to consequences which are desired. *If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result.* As the probability that the conse-

quences will follow decreases, and becomes less than substantial certainty, the actor's conduct loses the character of intent, and becomes mere recklessness.... As the probability decreases further, and amounts only to a risk that the result will follow, it becomes ordinary negligence.... All three have their important place in the law of torts, but the liability attached to them will differ.

RESTATEMENT (SECOND) OF TORTS § 8A cmt. b (emphasis added).

We now turn to whether Weiley sufficiently pled the elements of section 868 against Hospital. Weiley pled that, as the decedent's son and next of kin, Weiley is a family member who held the privilege of disposing of his father's body.[5] It is not clear from the record developed thus far if, and how, Hospital may have acquired this privilege or authority, as the trial court suggested. Although the trial court recognized that Hospital was "allegedly aware [Weiley] and his family did not want [his father's] organs harvested or his body used for medical experiments," it assumed that "[Hospital] listed the body as unclaimed in light of [Weiley's] lack of communication and, in due course, transferred the body to Temple." T.C.O. at 12.

However, nowhere in the complaint does Weiley indicate that Hospital listed the body as unclaimed and, even if this was done, Weiley nevertheless averred that he continued to hold the privilege of disposition of the body, did not authorize any transfer by Hospital or any other entity, and did not receive notification of Hospital's intent to transfer or donate the body to School. The trial court was compelled to accept all well-pled facts in the complaint as true for purposes of ruling on preliminary objections.

The trial court also emphasized its finding that Weiley failed to respond to multiple attempts by the Hospital to contact him following his father's death. Without citing any legal basis, the trial court seems to conclude that this somehow exonerated the Hospital from disposing of the body in the manner it did, or, for purposes of legal sufficiency, that Hospital could not be found to have acted intentionally or wantonly in making the donation to School. We disagree.

As indicated in our recitation of the facts above, gleaned from the complaint and attached exhibits, Hospital left either two or several messages with the family (and it is not clear if the messages were left with Weiley or another family member) on the morning of Weiley's father's death, around 5:30 a.m., on January 23, 2009. The trial court characterizes this as multiple attempts to contact Weiley about his father's death.

In any event, nothing in the complaint or attached exhibits indicates that Hospital tried to contact Weiley at any time after the morning of his father's death, until four days later, on January 27th, when he received the call from Ms. Bernard telling him the body "had been" transferred to School for "holding." Complaint at ¶ 29. Weiley had never received any prior notice of Hospital's intent to transfer or donate the body to School.[6] He specifically pled that Hospital did not try to contact him regarding its intention to transfer the body to School. Id. at ¶ 31. Neither Weiley nor anyone in his family ever gave Hospital consent to transfer the body. Id. at ¶ 30. And, in any event, as stated above, Weiley pled that Hospital possessed prior

---

5. "If there is not a surviving spouse, ... the next of kin shall have sole authority in all matters pertaining to the disposition of the remains of the decedent." 20 Pa.C.S. § 305(c).

6. The trial court mischaracterizes this point by finding that "[Hospital] again contacted Weiley on January 27, 2009 to inform him that his father's body was being transferred." T.C.O. at 8. If the body "was being transferred", maybe Weiley or the Hospital could have interrupted the transfer and prevented the dissection from occurring. But this is not how Weiley has pleaded the facts, and it is not clear when the body was transferred. All we can tell from the complaint on this point is that, at least by the time of Ms. Bernard's call on January 27th, the body had already been transferred without prior notice to or consent from Weiley, who claimed to hold the privilege of disposition at all relevant times.

knowledge that anatomical donation would be against Weiley and his family's wishes.

On the same day as Ms. Bernard's call (and after confirming the transfer with Funeral Home), Weiley tried to contact School to locate his father's body. However, he could not confirm the location of his father's body with the School until two days later, on January 29th, at which time he went to School to identify the body and found the evidence of dissection when he had to identify the body.

██ Taking these averments and all reasonable inferences as true, we conclude that Weiley's complaint states facts sufficient to withstand a demurrer at this phase of the litigation on the tort of interference with a dead body against Hospital. According to these facts and inferences, one could conclude the following. Weiley was the family member entitled to disposition of the body. This privilege or authority was not transferred to Hospital. Hospital knew that Weiley did not want organ donation or dissection. Yet, without trying to contact Weiley or otherwise obtain consent, it transferred and/or donated the body to School despite this knowledge. School accepted the body as an anatomical donation whereupon it was dissected. Hospital's unauthorized conduct caused this result, and, given Hospital's knowledge of Weiley's contrary wishes and Weiley's distraught feelings and involvement as expressed throughout the time of his father's treatment,[7] a factfinder could conclude that Hospital was substantially certain that Weiley would suffer serious emotional distress, sufficient for the "intentional" portion of section 868.

██ By this same analysis, Weiley avers sufficiently that Hospital acted with a conscious indifference or reckless disregard of a high risk of causing serious mental distress, for purposes of the "wanton mistreatment" portion of section 868. Again, this is based on Hospital's knowledge that Weiley was against dissection but then, despite this knowledge and without authorization or an attempt to seek consent, donated the body for that very purpose. This conduct could be viewed as a wanton mistreatment of the body.[8] *See,*

7. *See Palmer v. White Chapel Gardens, Inc.,* 38 Pa.D. & C.3d 608, 610 (Bucks Cty.1983), *aff'd per curiam,* 343 Pa.Super. 627, 494 A.2d 492 (1985) (finding liability under section 868 even under circumstances where grandson stopped visiting decedent in her last years of life and did not discover the fact of her death until five months after it occurred—but noting that grandson had lived with decedent for 22 years, she had adopted him, and that he initially visited often, even though he later only sent letters or cards).

8. Even though Hospital did not perform any dissections itself, according to the averments, it knew of Weiley's wishes, yet nevertheless engaged in conduct that caused the dissection to result. "An essential element of any cause of action in tort is that there must be some reasonable connection between the act or omission of the defendant and the injury suffered by the plaintiff." *Burnside v. Abbott Laboratories,* 351 Pa.Super. 264, 505 A.2d 973, 979 (1985). In *Burgess v. Perdue,* 239 Kan. 473, 721 P.2d 239, 243 (1986) the court compiled cases finding liability on hospitals for interference with a dead body for improperly authorizing third parties to perform autopsies. For example, the court in *Darcy v. Presbyterian Hosp. in City of New York,* 202 N.Y. 259, 95 N.E. 695 (1911), found the mother of decedent pled sufficient facts for a cause of action against the hospital for purposefully withholding the body and then causing the coroner to perform an autopsy to which the mother had previously refused to consent. *See also, e.g., Torres v. State,* 34 Misc.2d 488, 228 N.Y.S.2d 1005, 1007–8 (N.Y.Ct.Cl.1962) (finding hospital's efforts to notify next of kin of decedent's death insufficient and concluding hospital effectuated autopsy without proper consent). These courts' application of proximate causation is consistent with Pennsylvania law.

As for whether an unauthorized dissection, directly or indirectly caused, constitutes "mis-

*e.g., Palmer,* 38 Pa.D. & C.3d at 612 (finding wantonness under section 868 where cemetery failed to maintain accurate records of where it buried deceased, and used haphazard and shocking method of searching for body with a backhoe).

Finally, before leaving this issue, we must address Weiley's argument that we should expand this cause of action to include negligent conduct, as per the revised version of section 868 of the Restatement (Second) of Torts.[9] He further argues that the post-*Papieves* case of *Sinn v. Burd,* 486 Pa. 146, 404 A.2d 672 (1979), governing actions for NIED, should permit a close family member to recover for negligent mishandling of a body under this section. However, in *Hackett,* our Court rejected similar arguments, and we are bound by its holding on this particular point.

In *Hackett,* the plaintiff asserted a negligence claim to recover for emotional damages caused by the defendant's careless preparation of the plaintiff's mother's body and its mishandling of the casket during shipment from Pennsylvania to California, which resulted in damage to both the casket and the body. *Hackett,* 528 A.2d at 972. The Court recognized that the Restatement (Second) of Torts contained a revised and expanded section 868 to include negligent conduct. *Id.* at 973. However, the *Hackett* court stated that our Supreme Court had not considered or adopted the revised Restatement provision and concluded that "any extension of the *Papieves* rule of recovery to include actions for negligent infliction of emotional distress must come from the Supreme Court itself, through express adoption of the 1977 Restatement (Second) revision of Section 868." *Id.* at 974.[10]

Pennsylvania has not yet adopted the revised version of section 868 to include negligent interference with a body, and we are currently restricted to the *Papieves* Court's limitation of this tort to wanton or intentional conduct in accordance with the First Restatement of Torts section 868.

In sum on this issue, Weiley pled sufficient facts to support his claim against Hospital for wanton mistreatment and intentional transfer or operating on a body without privilege. This case is not free and clear from doubt at this stage in the litigation and, on the facts averred, we cannot say with certainty that no recovery is possible under this theory. However, we reject Weiley's request that we expand the tort of interference with a dead body at this time to include negligent conduct.

Thus, the order sustaining Hospital's preliminary objection with regard to this

---

treatment" of the body, one court equated dissection to disfiguration and mutilation of the body. *Lindh v. Great Northern Ry. Co.,* 99 Minn. 408, 109 N.W. 823, 824 (1906). Mistreat is defined as "to treat badly." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 760 (1983). Thus, while an authorized dissection may not be deemed treating a body badly, knowingly performing an unauthorized dissection could be, or knowing that one is causing an unauthorized dissection to be performed, could be.

9. The revised version reads: "One who intentionally, recklessly or negligently removes, withholds, mutilates or operates upon the body of a dead person or prevents its proper interment or cremation is subject to liability

to a member of the family of the deceased who is entitled to the disposition of the body." RESTATEMENT (SECOND) OF TORTS § 868 (1979).

10. Similarly, our Commonwealth Court, in *Kearney v. City of Philadelphia,* 150 Pa. Cmwlth. 517, 616 A.2d 72, 74 (1992), *appeal denied,* 534 Pa. 643, 626 A.2d 1160 (1993), refused to extend *Papieves* to include negligent conduct, stating, "only our Supreme Court could in essence overrule its own decision in *Papieves* and state now that Restatement (Second) of Torts § 868 is the law of Pennsylvania, rather than Restatement of Torts § 868."

count (labeled as "Count I" in the complaint), tortious interference with a dead body against Hospital, is reversed and remanded to the trial court for further proceedings consistent with this memorandum.

### *Tortious Interference with a Dead Body Against School and John Doe*

Weiley also asserted the tort of interference with a dead body against School and John Doe, at Counts V and XI of his complaint. In response, School filed preliminary objections contending, *inter alia,* (1) that School and John Doe had immunity as to all counts of the complaint pursuant to the Pennsylvania Anatomical Gift Act (Act), 20 Pa.C.S. § 8601 *et seq.,* and (2) that the complaint was legally insufficient to state a claim for "tortious interference with a dead body" against School and John Doe.[11] *See* Preliminary Objections of Temple University School of Medicine to Plaintiff's Complaint, 11/12/2010, at ¶¶ 11–42. The trial court sustained these preliminary objections as to School and John Doe, dismissing Counts V and XI. We affirm that ruling.

■ Weiley failed to plead any facts to establish that School's or John Doe's conduct was "wanton" or "intentional" as would support a claim for interference with a dead body. The averments only indicate that Weiley contacted School to learn "the whereabouts and/or status of the body" and "to locate" it. Complaint at ¶¶ 34–35. Weiley fails to indicate what, if anything, School or John Doe knew about the body, including Weiley's position against organ or tissue donation. He does not aver, for example, that he or Hospital ever informed School that organ or tissue donation was not authorized. He also fails

to indicate what, if anything, was communicated to him by School in these calls. Indeed, Weiley has not alleged any facts concerning his communications with School other than the vague assertion regarding his efforts to locate his father's body, which is not tantamount to notice of an objection to organ or tissue donation. Accordingly, accepting as true the well-pleaded facts of the complaint, we agree with the trial court that Weiley's claim against School for interference with a dead body is legally insufficient.

■ Moreover, we agree with the trial judge that School has immunity under the Pennsylvania Anatomical Gift Act. In this regard, section 8616(c) of the Act provides that any person "who acts in good faith in accordance with the terms of this subchapter ... is not liable for damages in any civil action or subject to prosecution in any criminal proceeding for his act." 20 Pa. C.S. § 8616(c). Again, Weiley points to no conduct on the part of School that would prohibit application of this immunity provision.

■ Finally, with regard to Weiley's claims against John Doe for interference with a dead body, since John Doe has never been identified, and has never entered an appearance, he is not a legal party. *See Anderson Equipment Company v. Huchber,* 456 Pa.Super. 535, 690 A.2d 1239, 1241 (1997) ("[A]n action at law implies the existence of legal parties; they may be natural or artificial persons, but they must be entities which the law recognizes as competent."). Therefore, we will not consider Weiley's claims against John Doe.

---

11. School noted in its preliminary objections that Weiley had not yet effectuated service of the Complaint upon John Doe. *See* Preliminary Objections of Temple University School of Medicine to Plaintiff's Complaint, 11/12/10, at ¶ 3.

### Tortious Interference with a Dead Body Against Funeral Home

■ For purposes of intentional or wanton conduct under section 868, Weiley's claim for interference with a dead body against Funeral Home is legally insufficient. He does not aver that Funeral Home had any knowledge with regard to any of the circumstances in this case. All one can reasonably conclude from the complaint is that Hospital hired Funeral Home to transfer the body to School. Although Weiley claims Funeral Home acted without Weiley's consent in making the transfer and failed to make a good faith effort to locate Weiley, there is nothing to indicate that Funeral Home had any reason to know that this was an unauthorized transfer or that it had any obligation to seek-out Weiley. Weiley certainly alleges nothing against Funeral Home that rises to the level of wanton or intentional conduct required for a section 868 claim.

### Intentional Infliction of Emotional Distress Against All Defendants

■ This tort requires, *inter alia*, intentional extreme and outrageous conduct on the part of the tortfeasor, which causes severe emotional distress to the plaintiff. *See, e.g., Hoy v. Angelone*, 554 Pa. 134, 720 A.2d 745, 754 (1998).[12] However, "where such conduct is directed at a third person" the person claiming the emotional distress must also establish that he is a member of the victim's immediate family and that he or she was "present at the time" of the tortious conduct. RESTATEMENT (SECOND) TORTS § 46(2); *Taylor v. Albert Einstein Med. Ctr.*, 562 Pa. 176, 754 A.2d 650, 652 (2000). In *Taylor*, a 16–year–old patient died during a medical procedure while her mother was in another room of the hospital. Since the mother was not present when the procedure that resulted in the patient's death was performed, and did not observe the conduct, she could not recover for IIED. *Id.* at 652. Similarly, we conclude that Weiley has not pled a claim for IIED against any of the defendants because he was not present when the allegedly tortious conduct that caused his serious mental distress occurred. It is on this basis that we affirm the trial court's dismissal of all IIED claims in this case.[13,14,15]

**12.** Our Supreme Court has noted that it has not had the occasion to adopt the tort of IIED expressly, but the Court has acknowledged its existence and has analyzed its elements in various respects. *See, e.g., Hoy*, 720 A.2d at 754 n. 10; *Kazatsky v. King David Mem'l Park, Inc.*, 515 Pa. 183, 527 A.2d 988, 988–89 (1987).

**13.** The trial court dismissed the IIED claims against all the defendants in this case after finding that the conduct alleged herein was not outrageous. T.C.O. at 13. However, as mentioned earlier, the trial court mischaracterized some of the averments in the complaint (*e.g.*, regarding the effort Hospital made to contact Weiley regarding the fact of his father's death). Additionally, the trial court ignored or discounted other averments, such as Weiley's lack of any notice of Hospital's intent to donate the body, Hospital's prior knowledge that Weiley was against anatomical donation, Weiley's never consenting to a donation, and the like, as previously detailed herein.

"Outrageousness" is not so easy to define and is highly subjective. *Kazatsky*, 527 A.2d at 994–95. "The species of tort created by section 46 provides only the most nebulous definition of 'outrageous' conduct." *Id.* at 993. However, "[w]here reasonable men may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability." *Id.* at 995 (Larson, J., concurring) (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. h). We believe that factfinders could reasonably disagree as to whether the Hospital's conduct as pled by Weiley at this stage in the litigation was "outrageous."

### Negligent Infliction of Emotional Distress Against Hospital

 The trial court found Weiley's NIED claim to be legally insufficient because he failed to establish that Hospital owed him a fiduciary duty of care. We agree.

As explained in *Doe v. Philadelphia Community Health Alternatives AIDS Task Force*, 745 A.2d 25, 26 (Pa.Super.2000), *aff'd*, 564 Pa. 264, 767 A.2d 548 (2001), the cause of action for negligent infliction of emotional distress is restricted to four factual scenarios: (1) situations where the defendant had a contractual or fiduciary duty toward the plaintiff; (2) the plaintiff was subjected to a physical impact; (3) the plaintiff was in a zone of danger, thereby reasonably experiencing a fear of impending physical injury; or (4) the plaintiff observed a tortious injury to a close relative. *See id.*

*Toney*, 961 A.2d at 198.[16] In his complaint, Weiley appears to rely on the first theory, in that he claims Hospital owed him a fiduciary duty of care that it breached, causing him to suffer severe emotional distress. As to that particular theory, we have noted:

> [t]he crux of a negligent infliction of emotional distress claim is that appellees breached some duty they owed to appellant and that that breach injured her.

*Id.* (citation omitted). "Therefore, under this theory of recovery, a plaintiff must establish the elements of a negligence claim, '*i.e.*, that the defendant owed a duty of care to the plaintiff, the defendant breached that duty, the breach resulted in injury to the plaintiff, and the plaintiff suffered an actual loss or damage.' " *Id.* (citations omitted).

We concluded that the plaintiff in *Toney* sufficiently pleaded the existence of a duty owed to her by the defendant by virtue of a heightened fiduciary relationship in that

---

Nevertheless, since we have disposed of this issue on the basis that Weiley failed to establish his presence at the time of the tortious conduct, as explained above, we need not make any conclusions or judgments with regard to whether the conduct as pled is "outrageous" for purposes of IIED. We affirm the trial court's dismissal of this claim on this alternate basis.

14. For an insightful explanation on why "presence" is not required for interference with a body under section 868, but is required for IIED, see Justice Castille's concurring opinion in *Taylor*, 754 A.2d at 654. In brief, Justice Castille recognized that requiring "presence" for the intentional tort of interference with a body would "almost always nullify the tort" because "such mistreatment [of a corpse] is extremely unlikely to occur in the presence of the deceased's family." *Taylor*, 754 A.2d at 654 (Castille, J., concurring).

15. The result in *Toney v. Chester County Hosp.*, 961 A.2d 192, 198 (Pa.Super.2008) (*en banc*), order *aff'd by equally divided court*, 36 A.3d 83 (Pa.2011), which dealt with an NIED claim, does not change our conclusion that

witnessing the event is required for an IIED claim, as per the Restatement text above. In *Toney*, our Court further expanded a cause of action of NIED under the limited circumstances where the claimant did not even witness the allegedly tortious conduct (*i.e.*, no "impact" or presence at all), but the defendant, as her physician, owed her a heightened fiduciary duty of care and the remaining elements of negligence had been pled sufficiently for purposes of reviewing preliminary objections. This analysis would not be relevant in a claim in Pennsylvania under section 46(2) of the Restatement (Second) Torts, which expressly requires presence, as explained above.

16. Recently, on December 22, 2011, our Supreme Court issued an opinion in support of affirmance in *Toney*. Since the Court was divided evenly, this opinion does not have precedential value, although it has persuasive value. *See Commonwealth v. Dorman*, 377 Pa.Super. 419, 547 A.2d 757, 761 (1988). Importantly, it also serves to affirm our Court's decision in *Toney*. *See id.*

particular physician-patient relationship (involving a physician who failed to detect prenatal abnormalities on ultrasound). Even though the plaintiff did not witness the tortious conduct, by virtue of this special fiduciary relationship, the defendant could foresee that his negligence would cause her serious emotional distress when her son was later born.

Here, although Weiley claims Hospital owed him a fiduciary duty, he fails to plead sufficiently in his complaint the basis for this assertion. He only asserts vaguely that he was next-of-kin who "relied upon the representations of [Hospital's] agents, workers, officers, and/or employees with regard to the treatment of his father, and disposition of [his father's] body." Complaint at ¶ 53.

 A confidential relationship between two parties can give rise to fiduciary duties owed by one to the other. *Basile v. H & R Block, Inc.*, 777 A.2d 95, 102 (Pa.Super.2001). "In some cases, as between trustee and cestui que trust, guardian and ward, attorney and client, and principal and agent, the existence of a confidential relationship is a matter of law." *Id.* (quoting *In re Estate of Mihm*, 345 Pa.Super. 1, 497 A.2d 612, 615 (1985)).

> In other cases, where these relationships do not exist, confidential relations may still arise based on the facts and circumstances apparent on the record. Both our Supreme Court and other courts have recognized that those who purport to give advice in business may engender confidential relations if others, by virtue of their own weakness or inability, the advisor's pretense of expertise, or a combination of both, invest such a level of trust that they seek no other counsel.

*Id.* (citations omitted). In any event,

> "[t]he essence of [a confidential] relationship is trust and reliance on one side, and a corresponding opportunity to abuse that trust for personal gain on the other." Accordingly, "[a confidential relationship] appears when the circumstances make it certain the parties do not deal on equal terms, but, on the one side there is an overmastering influence, *or*, on the other, weakness, dependence or trust, justifiably reposed[.]"

*Id.* at 101 (citations omitted). "[T]he party in whom the trust and confidence are reposed must act with scrupulous fairness and good faith in his dealings with the other and refrain from using his position to the other's detriment and his own advantage." *Id.* (quoting *Young v. Kaye*, 443 Pa. 335, 279 A.2d 759, 763 (1971)).

Additionally, in Justice Baer's opinion in support of affirmance in *Toney*, he stated, "we find it prudent to limit the reach of this NIED claim to preexisting relationships involving duties that obviously and objectively hold the potential of deep emotional harm in the event of breach" and that these "special relationships must encompass an implied duty to care for the plaintiff's emotional well-being." *See Toney*, 36 A.3d at 95. He noted that, because of this heightened standard, not even all doctor-patient relationships could qualify, but that the one in *Toney* did, because of the sensitive field of obstetrics and the implied duty of this particular doctor, given his role in prenatal diagnosis, to care for his patient's emotional well being under these particular circumstances. *Id.*

 Weiley's complaint is legally insufficient to establish that Hospital owed Weiley any fiduciary duty of care sufficient for the duty element of an NIED claim. Weiley made no attempt to assert or explain, for example, how Hospital failed to deal with him on equal terms, or what advice or counsel from Hospital he relied upon to his detriment, or how Hospital used its position to Weiley's detriment and to its own advantage, or how he had anything akin to

the patient-doctor relationship presented in *Toney.*

For these reasons, the trial court did not err by finding no fiduciary relationship and dismissing the NIED claim against Hospital. We need go no further to determine whether the other elements of an NIED claim were pled sufficiently, as this claim fails on this basis alone.

### Punitive Damages Claims

 Weiley asserts punitive damages against all the defendants. In awarding punitive damages, "[t]he state of the mind of the actor is vital." *Feld v. Merriam,* 506 Pa. 383, 485 A.2d 742, 748 (1984). "The act, or the failure to act, must be intentional, reckless or malicious." *Id.* As explained above, with regard to the tort of interference with a dead body under section 868, based on the facts averred, a factfinder could determine that Hospital's conduct was intentional or reckless. Accordingly, we remand the issue of punitive damages with regard to that particular claim.

For the foregoing reasons, we reverse the trial court's order sustaining the preliminary objections of Hospital and dismissing Weiley's claim of intentional interference with a dead body against Hospital (Count I). Thus, we remand for consideration of that claim in accordance with this memorandum. We also remand the punitive damages claim related to Count I. The court's dismissal of the remaining claims was proper and we affirm those portions of the court's orders.

Order affirmed in part, reversed in part, and remanded for further proceedings. Jurisdiction relinquished.

Judge OTT concurs in the result.