**Mary E. GLOVER, Individually and on Behalf of Other Similarly Situated Former and Current Homeowners in Pennsylvania, Appellant**

v.

**UDREN LAW OFFICES, P.C., A New Jersey Debt Collector, Appellee.**

**Edella Johnson (a/k/a Edella Robinson, a/k/a Edella Robinson Johnson), Eric Johnson, Individually and on Behalf of Other Similarly Situated Former and Current Homeowners in Pennsylvania, Appellants**

v.

**Phelan Hallinan & Schmieg, LLP, Appellee.**

Superior Court of Pennsylvania.

Argued Jan. 10, 2013.

Filed April 23, 2014.

Reargument Denied June 23, 2014.

Michael P. Malakoff, Pittsburgh, for appellants.

Jonathan J. Bart, Philadelphia, for appellees.

BEFORE: DONOHUE *, SHOGAN and WECHT, JJ.

OPINION BY DONOHUE, J.:

In these appeals, Mary E. Glover, individually and on behalf of a similarly situated class ("Glover"), and Ed Ella and Eric Johnson, individually and on behalf of a similarly situated class ("the Johnsons"), appeal from the orders of court sustaining preliminary objections filed by Udren Law Offices, P.C. ("Udren") and Phelan Hallinan & Schmieg, LLP ("Phelan") and dismissing the appellants' complaints with prejudice. We affirm.

At the outset, we explain our decision to address these appeals together. The claims raised by Glover and Johnson are based on similar facts, raise claims alleging the same violations of the same laws, and name the law firm that acted as foreclosure counsel for their mortgagee as defendants. Furthermore, and more to the point, the Johnsons agreed in the trial court that this Court's resolution of the issues raised in Glover's case would control the outcome of their case. *See* Trial Court Order, 7/ 16/ 12 (sustaining Phelan's preliminary objections, dismissing the John-

---

* Writing of the majority opinion was reas-    signed to this author on March 17, 2014.

sons' complaint and stating that "parties agree that *Glover v. Udren* [ ] governs this litigation."); Trial Court Order, 9/4/12 ("[B]oth parties agree that this case is governed by my [m]emorandum and [o]rder dated June 13, 2012 entered in *Glover v. [Udren]* ... The *Glover* ruling is on appeal."). For these reasons, we have elected to address these appeal together and we address only the claims raised by Glover.[1]

We begin with a summary of the relevant factual history, as set forth by the trial court:

> On August 2, 2002, [Glover] entered into a mortgage transaction with Washington Mutual Bank ('WaMu'). On August 18, 2005, [Glover's] mortgage was in default and she was told she owed $551.08. On December 1, 2005, [Glover] and WaMu entered into a forbearance agreement. The agreement stated that on 'April 1, 2006, we will reevaluate your application for assistance. If you do not have evidence of full time employment at that time, we will have to deny your application[.]' On March 14, 2006, WaMu denied a loan workout.
>
> On April 10, 2006[,] [Udren], as counsel for WaMu filed a Complaint in Mortgage Foreclosure. The foreclosure complaint in paragraph [six] asked for 'Court Costs (anticipated, excluding Sheriff's Sale costs)' of $280.00 and 'Attorneys Fees (anticipated and actual to 5% of principal)' in the amount of $1,250.00.

> On June 7, 2006, WaMu 'flip-flopped' and offered [Glover] a Loan Modification Agreement under which, beginning August 1, 2006, [Glover] would begin to again make payments but in an increased amount. [According to the allegations pled in Glover's complaint, in the June 7, 2006 letter, WaMu added $2,237.73 to Glover's principal balance and charged her $806.45 for delinquent interest and $1,431.19 for 'escrow advance/set up.' WaMu also indicated that Glover owed $3,696 for 'foreclosure fees and costs, and demanded payment of the foreclosure fees and costs. Glover did not remit this amount, but began making payments to WaMu.]
>
> The loan was transferred to Wells Fargo on December 1, 2006. On January 4, 2008, [Glover] and Wells Fargo entered into a loan modification/restructure and 'it was mutually agreed that a contribution of $1,492.39 would be required, which will be applied toward the delinquency.'
>
> This Loan Modification Agreement states that the unpaid principal balance as of February 4, 2008 is $9,508.36 and the modified principal balance is $12,152.02.... [Glover] made payments in accordance with the loan modification agreement.

Trial Court Opinion, 6/13/12, at 1–3 (citation to Glover's complaint omitted).

On June 9, 2008, Glover commenced this action in state court against WaMu, Wells Fargo, and Udren. She alleged violations of the Loan Interest and Protection Act ("Act 6"),[2] 41 P.S. § 101 *et seq.*; the Uni-

---

**1.** Additionally, although Glover is proceeding in her own right and on behalf of similarly situated individuals, for clarity and ease of reference we will refer only to Glover.

**2.** This statute is commonly referred to as Act 6 as it was enacted as the "Act of January 30, 1974 (P.L. 13, No. 6)." Act 6 has been amended various times, most recently in

2008. S.B. 483, 192d Gen. Assemb., Reg. Sess. (Pa.2008). The preamble to Act 6 describes it as follows:

> An Act regulating agreements for the loan or use of money; establishing a maximum lawful interest rate in the Commonwealth; providing for a legal rate of interest; detailing exceptions to the maximum lawful in-

form Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. § 201-1, *et seq.;* the Fair Credit Extension Uniformity Act ("FCEUA"), 73 P.S. § 2270.1, *et seq.;* and the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, *et seq.* The case was removed to the Western District of Pennsylvania, where the parties agreed to the dismissal of Glover's claims under Act 6 and the UTPCPL without prejudice to her right to pursue them in state court.

On August 31, 2011, Glover raised these statutory claims in a complaint filed in the Court of Common Pleas of Allegheny County. Specifically, Counts I–IV of the complaint alleged violation of section 406 of Act 6 and Counts V–IX alleged violations of the UTPCPL. *See* Complaint, 8/31/11, at 17–27. Udren filed preliminary objections in response thereto, demurring as to each count raised in the complaint. Preliminary Objections, 10/21/11, at 3–9. The trial court heard argument on Udren's preliminary objections on February 2, 2012 and on June 13, 2012, it sustained the preliminary objections and dismissed Glover's complaint with prejudice.[3]

■ With that background, we turn our attention to the issues raised on appeal:[4]

1. Did [Glover] (a homeowner) plead viable claims against [Udren] (a debt collector), under Act 6?

2. Did [Glover] plead viable claims against [Udren] under the UTPCPL?

Glover's Brief at 2. Although not explicit in Glover's statement of questions, we are mindful that she is challenging the trial court's ruling on Udren's preliminary objections. When reviewing a challenge to an order sustaining preliminary objections, we recognize that

[t]he impetus of our inquiry is to determine the legal sufficiency of the complaint and whether the pleading would permit recovery if ultimately proven. This Court will reverse the trial court's decision regarding preliminary objections only where there has been an error of law or abuse of discretion. When sustaining the trial court's ruling will result in the denial of claim or a dismissal of suit, preliminary objections will be sustained only where the case i[s] free and clear of doubt.... Thus, the question presented by the demurrer is

terest rate for residential mortgages and for any loans in the principal amount of more than fifty thousand dollars and federally insured or guaranteed loans and unsecured, uncollateralized loans in excess of thirty-five thousand dollars and business loans in excess of ten thousand dollars; providing protections to debtors to whom loans are made including the provision for disclosure of facts relevant to the making of residential mortgages, providing for notice of intention to foreclose and establishment of a right to cure defaults on residential mortgage obligations, provision for the payment of attorney's fees with regard to residential mortgage obligations and providing for certain interest rates by banks and bank and trust companies; clarifying the substantive law on the filing of an execution on a confessed judgment; prohibiting waiver of provisions of this act, specifying powers and duties of

the secretary of banking, and establishing remedies and providing penalties for violations of this act.

Act of Jan. 30, 1974, P.L. 13, No. 6.

3. The trial court did not order the filing of a statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b), nor did it author an opinion pursuant to Pa.R.A.P. 1925(a).

4. The Johnsons phrased the questions presented on appeal differently, parsing their issues into five, rather than two, questions for our review. Johnsons' Brief at 2. To the extent that the Johnsons have included issues beyond those presented in Glover's appeal, we conclude that they are waived, as they agreed to be bound by the resolution of Glover's appeal.

whether, on the facts averred, the law says with certainty that no recovery is possible. Where a doubt exists as to whether a demurrer should be sustained, this doubt should be resolved in favor of overruling it.

*Weiley v. Albert Einstein Med. Ctr.*, 51 A.3d 202, 208–09 (Pa.Super.2012) (citations omitted).

Glover's initial claim is that the trial court erred as a matter of law in concluding that no cause of action may lie against Udren for a violation of 41 P.S. § 406, *infra*, which controls attorney's fees under Act 6. Glover's Brief at 8. An issue challenging the interpretation of a statute presents a question of law, for which our standard of review is *de novo* and our scope of review is plenary. *Renna v. Schadt*, 64 A.3d 658, 664 (Pa.Super.2013).

Glover argues that Udren, as foreclosure counsel, violated section 406 by collecting certain costs and fees prohibited by that provision.[5] Glover's Brief at 8–11. The premise of this claim is that Udren, acting in its capacity as the attorney for the mortgagee, violated section 406 by collecting fees in excess of those allowed under Act 6, and therefore, Glover is entitled to treble damages as provided by section 502, *infra*, which provides remedies for violation of the Act.

We begin with the relevant statutory language. Article IV of Act 6 contains the statute's protective provisions. As noted above, it is undisputed that Glover pled claims alleging violations of only one of these protective provisions, section 406, which provides as follows:

§ 406. Attorney's fees payable

With regard to residential mortgages, no *residential mortgage lender* shall contract for or receive attorney's fees

from a residential mortgage debtor except as follows:

(1) Reasonable fees for services included in actual settlement costs.

(2) Upon commencement of foreclosure or other legal action with respect to a residential mortgage, attorney's fees which are reasonable and actually incurred by the residential mortgage lender may be charged to the residential mortgage debtor.

(3) Prior to commencement of foreclosure or other legal action attorneys' fees which are reasonable and actually incurred not in excess of fifty dollars ($50) provided that no attorneys' fees may be charged for legal expenses incurred prior to or during the thirty-day notice period provided in section 403 of this act.

41 P.S. § 406 (emphasis added). Article V contains the remedies and penalties granted by Act 6, and section 502 provides a remedy for the imposition of excessive rates and fees:

§ 502. Usury and excess charges recoverable

A person who has paid a rate of interest for the loan or use of money at a rate in excess of that provided for by this act or otherwise by law or has paid charges prohibited or in excess of those allowed by this act or otherwise by law may recover triple the amount of such excess interest or charges in a suit at law against the *person* who has collected such excess interest or charges: Provided, That no action to recover such excess shall be sustained in any court of this Commonwealth unless the same shall have been commenced within four years from and after the time of such payment. Recovery of triple the

---

**5.** Because the resolution of this issue turns of the interpretation of the statute, we need not detail the precise fees and costs that Glover contends were in violation of the statute.

amount of such excess interest or charges, but not the actual amount of such excess interest or charges, shall be limited to a four-year period of the contract.

41 P.S. § 502 (emphasis added). Act 6 also contains the following relevant definitions:

'Person' means an individual, corporation, business trust, estate trust, partnership or association or any other legal entity, and shall include but not be limited to residential mortgage lenders.

\* \* \*

'Residential mortgage lender' means any person who lends money or extends or grants credit and obtains a residential mortgage to assure payment of the debt. The term shall also include the holder at any time of a residential mortgage obligation.

41 P.S. § 101.

"The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly. Every statute shall be construed, if possible, to give effect to all its provisions." 1 Pa.C.S.A. § 1921(a). "It is presumed that every word, sentence or provision of a statute is intended for some purpose and accordingly must be given effect." *Commonwealth v. Lobiondo,* 501 Pa. 599, 603, 462 A.2d 662, 664 (1983) (citing *Commonwealth v. Sitkin's Junk Co.,* 412 Pa. 132, 138, 194 A.2d 199, 202 (1963)); *see also Toy v. Metro. Life Ins. Co.,* 593 Pa. 20, 57, 928 A.2d 186, 209 (2007) ("The legislature must be intended to mean what it has plainly expressed."). It is firmly established that this Court may not disregard the choice of term used by the Legislature. *Commonwealth v. Pope,* 455 Pa. 384, 388, 317 A.2d 887, 889 (1974) ("A court may not alter, under the guise of 'construction,' the express language and intent of the Legislature."); *Common-*

*wealth v. Deck,* 954 A.2d 603, 609 (Pa.Super.2008) ("This Court ... does not have the authority to ignore clear statutory language, even in pursuit of a statute's spirit[.]"); *City of Allentown v. Pennsylvania Pub. Util. Comm'n,* 173 Pa.Super. 219, 96 A.2d 157, 158 (1953) (holding that when interpreting a statute, a court may not delete or disregard words contained therein).

■  Before applying these interpretive rules, we recap Glover's argument: Because section 502 provides a remedy against a person who collects excess fees and charges, and person is defined broadly to "include but not be limited to residential mortgage lenders," Glover can maintain a cause of action against the residential mortgage lender's foreclosure attorney for collecting attorney's fees in excess of those described in section 406.

Given the principles of statutory interpretation by which we are bound, we must reject Glover's argument. To do otherwise would require us to rewrite section 406 and the conduct proscribed by it. By using the specific term "residential mortgage lender" in section 406, the Legislature has expressed its intention to control the conduct of residential mortgage lenders as defined under Act 6 when the residential mortgage lenders contract for attorney's fees and receive those fees from borrowers. The use of this term makes clear that only residential mortgage lenders can commit a violation of section 406 by contracting for or receiving fees in excess of those specified therein. As Udren is not a residential mortgage lender, it cannot violate section 406.

Glover acknowledges that section 406 "regulates attorney fee provisions contained within ... contracts that are entered into by homeowners and residential mortgage lenders, not their foreclosure

counsel[,]" but argues that section 502 must be read to encompass law firms acting for residential mortgage lenders because "regulating a residential mortgage lender's ability to contract for and receive such ... fees would not, by itself, protect homeowners from paying such fees if the law permitted law firms to collect those fees on behalf of servicer [*sic*]." Glover's Brief at 18.[6] We are not swayed by this argument. As discussed above, the Legislature intentionally used the term "residential mortgage lender" to define the entities subject to the constraints contained in section 406. Had it intended to include law firms that act on the behalf of residential mortgage lenders in the prosecution of foreclosure actions, it would have made this explicit in the text of the statute. Moreover, section 406 limits the amount of attorney's fees for which a residential mortgage lender and borrower may contract. 41 P.S. § 406. A law firm acting as foreclosure counsel for a residential mortgage lender is not a part of the agreement between the residential mortgage lender and borrower.

Section 502 is a general *remedial* provision for conduct prohibited by Act 6 or otherwise involving the loan of money. *See Roethlein v. Portnoff Law Assoc. Ltd.*, —— Pa. ——, ——, 81 A.3d 816, 825 (2013) (rejecting claim against private tax collectors because "[s]ection 502 does not support a cause of action to challenge costs, unless those costs are incurred in connection with the loan or use of money."). Indeed, section 502 is contained within that portion of Act 6 which is entitled "remedies and penalties." We reject the notion that by use of the term "person" in section 502, the Legislature inferentially expanded the scope of potential violators of section 406 of the Act. While it is clear that the Legislature defined the term person to include various generic legal entities[7] "include[ing] but not [ ] limited to residential mortgage lenders," we read the definition to clarify that various sections of the Act do not apply *only* to residential mortgage lenders. While the majority of the provisions in Act 6 apply to residential mortgage transactions, Act 6 also addresses conduct by actors other than residential mortgage lenders. *See e.g.*, 41 P.S. §§ 201 (governing the maximum lawful interest rate allowed for the loan or use of money in the amount of $50,000 or less); 407(c) (forbidding a plaintiff in confessed judgment action from receiving payment from defendant for costs associated with satisfying judgment); 503 (providing that reasonable attorney's fees are recoverable for a prevailing "borrower or debtor, including but not limited to a residential mortgage debtor[.]"); Preamble of Act 6, n. 1, *supra*. Thus, the definition of "person" in section 101 makes clear that when the term "per-

6. Glover uses the terms "foreclosure counsel" and "debt collection counsel" interchangeably. The allegations contained in Glover's amended complaint make absolutely clear that Udren, a law firm, was at all times acting on behalf of the mortgagee in prosecuting a foreclosure action and not as a debt collector as defined in FCEUA. *See* 73 P.S. § 2270.3 (defining a debt collector to include "[a]n attorney, whenever such attorney attempts to collect a debt ... except in connection with the filing or service of pleadings or discovery or the prosecution of a lawsuit to reduce a debt to judgment."). Since Udren was an attorney acting on behalf of a mortgagee in a foreclosure action, the purpose of which was to reduce a debt to judgment, it cannot be classified as a debt collector. Glover's claims under FCEUA and FDCPA were dismissed by the federal district court prior to the commencement of this action. *See Glover v. Udren*, 2011 WL 1496785 (W.D.Pa.2011).

7. 41 P.S. § 101 (" 'Person' means an individual, corporation, business trust, estate trust, partnership or association or any other legal entity, and shall include but not be limited to residential mortgage lenders.").

son" is used, it is not limited to residential mortgage lenders.

■ We reiterate that this Court may not disregard the words of a statute in an attempt to give effect to what we presume the purpose of the statute to be. *Pope*, 455 Pa. at 388, 317 A.2d at 889; *Deck*, 954 A.2d at 609; *City of Allentown*, 96 A.2d at 158. This is exactly what Glover asks us to do, and so her argument is unavailing.

■ In her second issue, Glover challenges the trial court's dismissal of her claims under the UTPCPL. Glover's Brief at 19. We find no error in the trial court's ruling.

The trial court dismissed the UTPCPL claims upon finding that all of the claims alleged thereunder were made in connection with Udren's filing of the foreclosure complaint, and its conclusion that the UTPCPL does not apply to actions taken by attorneys while practicing law. Trial Court Opinion, 6/13/12, at 7–14. Our review of the record supports the trial court's finding that all of Glover's UTPCPL claims are based explicitly upon allegations regarding actions taken by Udren in connection with the filing of the foreclosure complaint. *See* Complaint, 8/31/11, at 22–27. To determine whether such claims are viable under the UTPCPL, we look to the Pennsylvania Supreme Court's decision in *Beyers v. Richmond*, 594 Pa. 654, 937 A.2d 1082 (2007), in which it held that the UTPCPL does not apply to claims of attorney misconduct in the context of practicing law. *Id.* at 659–60, 937

A.2d at 1086.[8] Accordingly, we agree that Glover's claims are not viable under the UTPCPL.

Having found no error of law or abuse of discretion, we affirm the trial court's orders. *Weiley*, 51 A.3d at 208.

Orders affirmed.

WECHT, J. files a Concurring and Dissenting Opinion.

## CONCURRING AND DISSENTING OPINION BY WECHT, J.:

I join the learned majority's determination that no relief may be granted for the claims made by Mary E. Glover and Edella and Eric Johnson ("Appellants")[1] under the Uniform Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. §§ 201–1, *et seq.*, albeit subject to the qualification set forth below. However, I respectfully dissent from the majority's conclusion that Appellants failed to plead claims upon which relief could be granted under Pennsylvania's Loan Interest Protection Act ("Act 6"), 41 P.S. §§ 101, *et seq.* For the reasons set forth herein, I would reverse the trial court's ruling dismissing those claims.

In order to explain my reasons for differing with the majority, I think it best to supplement the majority's apt but foreshortened account of Glover's claims in this case. Glover alleged that New Jersey law firm Udren Law Offices, P.C. ("Udren"), engaged in improper behavior

---

**8.** Although *Beyers* is a plurality decision, this holding garnered the support of a majority of the Court. *See Beyers*, 594 Pa. at 671, 937 A.2d at 1093 (Cappy, C.J. concurring) (joining Justice Fitzgerald's opinion "to the extent that it holds that as a matter of statutory construction, the [UTPCPL] does not apply to attorneys practicing law."). Therefore, this holding is binding precedent. *See Commonwealth*

*v. Brown*, 23 A.3d 544, 556 (Pa.Super.2011) ("In cases where a concurring opinion enumerates the portions of the plurality's opinion in which the author joins or disagrees, those portions of agreement gain precedential value.").

**1.** For the reasons set forth by the majority, I treat the separate appellants collectively. *See* Maj. Op. at 25–26.

in its capacity as a debt-collector and fore-closure counsel for mortgagee.[2] On August 2, 2002, Glover entered into a thirty-year mortgage with mortgagee. In March 2005, following an injury, Glover requested a loan modification to reduce her payments. On August 18, 2005, mortgagee responded with a "Notice of Collection Activity" which specified that Glover was in "serious default," and enumerated alleged arrears of $559.15. The notice provided that, if Glover failed to remit payment of that amount, mortgagee would commence foreclosure proceedings.

On December 1, 2005, Glover and mortgagee entered into a forbearance agreement. Mortgagee also agreed to review Glover's application for financial assistance on April 1, 2006. However, on March 14, 2006, mortgagee notified Glover that it had denied her application for a loan modification.

Sometime after March 14, 2006, an Udren attorney telephoned Glover and advised her that she immediately must remit $1,700 in missed payments as well as attorney's fees and costs of $1,697.28, for a total of $3,397.28. Glover failed to pay, and Udren filed a foreclosure complaint, claiming a total of $12,652.36, which encompassed itemized obligations including outstanding principal, unpaid interest, anticipated court costs, escrow, late charges, and "Attorneys['] fees [of $1,250] (anticipated and actual to 5% of principal)." Glover Complaint at 6–7 ¶¶ 13–15.

Mortgagee later offered Glover a loan modification agreement. Therein, mortgagee specified an " 'Unpaid Principal Balance' of $11,941.30 consisting of the amount(s) loaned to the Borrower by the Lender and any interest capitalized to date." Glover Complaint, Exh. H ("Loan Modification Agreement"). That amount included an addition of $2,237.73 to Glover's principal, additional charges, including delinquent interest and "escrow advance/set up"; and $3,696.00 in "foreclosure fees and costs." *Id.* Glover did not remit $3,696.00, but commenced making her monthly payments as modified.

On January 4, 2008, Glover and mortgagee entered into a new loan modification agreement that increased Glover's principal balance from $9,508.36 to $12,152.02, increased her monthly payment, and increased her repayment period by six years. The increased principal included $1,859.32 for "Escrow" and $1,571.02 for "Corp Recov/Title/Mod Fees/Atty/FC/BPO/Appraisal." Glover continued to make monthly payments pursuant to the new modified agreement.

Following federal proceedings detailed by the majority, *see* Maj. Op. at 26–27, Glover filed suit in the Court of Common Pleas of Allegheny County, alleging that Udren violated Act 6 and the UTPCPL. Glover alleged the following Act 6 violations: Udren charged flat-rate or percentage-based attorneys' fees rather than hourly fees (count I); charged such fees before the services were performed and had been billed to the foreclosure plaintiff (count II); charged such fees prematurely prior to or during the 30–day notice of foreclosure period, and filed fees in excess of $50 before filing a foreclosure complaint (count III); and charged such fees prior to

---

**2.** Each case involves a confusing array of mortgagees and mortgage servicers which at various times have owned or serviced Appellants' respective mortgages. However, in each of the instant cases, only the attorneys for the mortgagees were named as defendants. Thus, the identity of the relevant mortgagees and servicers has no bearing on my analysis. Accordingly, I employ the word "mortgagee" to refer to the non-party clients of attorney-Appellees.

entry of judgment and/or a sheriff's sale without court approval (count IV). In counts V through IX, Glover asserted that the above-stated acts also warranted relief under the UTPCPL.

Udren filed preliminary objections alleging that Glover failed to state claims upon which relief could be granted. On June 13, 2012, the Allegheny County Court of Common Pleas entered a Memorandum and Order of Court sustaining Udren's preliminary objections to all counts raised by Glover and dismissing Glover's complaint with prejudice.[3] The court found that Udren was not a "residential mortgage lender" ("RML") subject to liability under Act 6. The court rejected Glover's UTPCPL claims because Udren, serving as counsel in connection with a foreclosure action, was engaged in the practice of law, and therefore exempt from UTPCPL liability by our Supreme Court's decision in *Beyers v. Richmond,* 594 Pa. 654, 937 A.2d 1082 (2007).

The trial court's reasoning regarding Act 6 warrants reproduction:

> [Glover] is pursuing a private cause of action under Act 6 pursuant to section 502 . . ., which permits a person who has paid charges prohibited by or in excess of those allowed by law to recover the amount of the excess charges in a lawsuit against the person who collected such excess charges. This Section reads as follows:
>
> § 502. **Usury and excess charges recoverable**
>
> A person who has paid a rate of interest for the loan or use of money at a rate in excess of that provided for by this act or otherwise by law or has paid charges prohibited or in excess of

those allowed by this act or otherwise by law may recover triple the amount of such excess interest or charges in a lawsuit against the person who has collected such excess interest or charges.

Under the structure of Act 6, a person may recover damages under Section 502 only upon a showing that the defendant charged fees in violation of other provisions of Act 6 or otherwise by law. Section 406 is the provision in Act 6 upon which [Glover] relies to support her claims under Section 502. This provision reads as follows:

> § 406. **Attorney's fees payable**
>
> With regard to residential mortgages, no *residential mortgage lender* shall contract for or receive attorney's fees from a residential mortgage debtor except as follows:
>
> (1) Reasonable fees for services included in actual settlement costs.
>
> (2) Upon commencement of foreclosure or other legal action with respect to a residential mortgage, attorney's fees which are reasonable and actually incurred by the residential mortgage lender may be charged to the residential mortgage debtor.
>
> (3) Prior to commencement of foreclosure or other legal action attorneys' fees which are reasonable and actually not in excess of fifty dollars ($50) provided that no attorneys' fees may be charged for legal expenses incurred prior to or during the thirty-day notice period provided in section 403 of this act.

Section 406 regulates only the fees that [an RML] may contract for or receive. [An RML] is defined in Section 101 of

---

**3.** Because the relevant trial court opinion on its face addressed only the Glover litigants, my account of that opinion does the same.

Act 6 as "any person who lends money or extends or grants credit and obtains a residential mortgage to assure payment of the debt." [Udren] never lent money to [Glover] or obtained a residential mortgage from [Glover]. Thus, [Udren] is not [an RML]; [Udren] is, instead, a debt collector governed by [the FCEUA]....

Since [Glover] relies solely on Section 406, since Section 406 applies only to [RMLs], and since [Udren] is not [an RML], I am dismissing [Glover's] claims raised in Counts I–IV for failure to plead any violations of Act 6 that would allow recovery under Section 502.

Trial Court Opinion ("T.C.O."), 6/13/2012, at 3–5 (original footnotes omitted; emphasis by trial court).

With regard to Glover's UTPCPL claims, the trial court emphasized that none of the alleged violations were based upon Pennsylvania's Fair Credit Extension Uniformity Act ("FCEUA"), 73 P.S. §§ 2270.1, et seq. Id. at 7. The trial court noted that Appellants' overarching claims prompted the question whether the UTPCPL applies to "the misconduct of a law firm." Id. at 9. In considering that question, the court surveyed Pennsylvania's limited legal authority on that question.[4]

The trial court ruled for the following reasons that Udren was not subject to the UTPCPL:

[W]here a claim brought against a law firm attempting to collect a debt on behalf of a creditor is based on unfair or deceptive acts or practices, in [the FCEUA, 73 P.S. § 2270.3(3)(ii) ], the Legislature has drawn a line that ex-

cludes alleged unfair practices arising out of the filing of pleadings and the prosecution of a lawsuit to reduce a debt to judgment.

Since the [FCEUA] provides that violations of this Act constitute violations of the [UTPCPL], [see 73 P.S. § 2270.4,] the Legislature would have intended that any legislation regulating unfair collection practices would exempt from coverage activities of a law firm in the prosecution of a lawsuit to reduce a debt to judgment. In other words, the Legislature would not have intended for legislation that is not specifically directed to debt collectors to provide a remedy for conduct that is explicitly excluded from legislation that is directed to debt collectors.

T.C.O. at 10–11.

Because Glover's only substantive averments in connection with her UTPCPL claims consisted of alleged impropriety in Udren's act of "filing Foreclosure Complaints" that charged improper fees, id. at 11 (quoting Glover Complaint at 23 ¶ 77), Udren was acting as an attorney rather than a debt collector. Id. at 11. Consequently, the trial court concluded that *Beyer* precluded relief for Glover's claims.

Appellants' arguments call upon this Court to interpret various statutory provisions. Thus, we apply a *de novo* standard of review, and the scope of our review is plenary. *See Bowling v. Office of Open Records*, —— Pa. ——, 75 A.3d 453, 466 (2013).

[W]ith all questions of statutory interpretation, our object is to ascertain and effectuate the intention of the General

---

4. In particular, the trial court reviewed our Supreme Court's plurality decision in *Beyers, supra.* In that case, in which the plaintiff made claims against her attorney regarding the attorney's misappropriation of certain set-

tlement funds to which plaintiff was entitled, the Court held that the UTPCPL did not apply to "attorney conduct in the context of the practice of law." T.C.O. at 9 (quoting *Beyers*, 937 A.2d at 1089).

Assembly, giving effect, if possible, to all provisions of the statute under review. 1 Pa.C.S. § 1921(a). Generally, the best indication of legislative intent is the statute's plain language. Further, the plain language of each section of a statute must be read in conjunction with one another, construed with reference to the entire statute. We presume that the General Assembly does not intend a result that is absurd, impossible of execution, or unreasonable, and that the General Assembly intends the entire statute to be effective and certain. 1 Pa.C.S. §§ 1922(1), (2).

*Bowling,* 75 A.3d at 466 (case citations omitted). Moreover, we must liberally construe statutes "to effect their objects and promote justice." 1 Pa.C.S. § 1928(c).

In the context of remedial statutes such as Act 6 and the UTPCPL, statutes "predicated on a legislative recognition of the unequal bargaining power of opposing forces in the marketplace" that are designed "to ensure the fairness of market transactions," we must construe them broadly to effectuate their intended ends. *Creamer v. Monumental Props., Inc.,* 459 Pa. 450, 329 A.2d 812, 816 (1974) (citing *Verona v. Schenley Farms Co.,* 312 Pa. 57, 167 A. 317, 320 (1933)). The UTPCPL, in particular, serves "to protect the public from fraud and unfair or deceptive business practices," and therefore "is to be liberally construed in order to effectuate its purpose." *Keller v. Volkswagen of Am., Inc.,* 733 A.2d 642, 646 (Pa.Super.1999) (citing 73 P.S. § 201–2(4)). This is reinforced by the fact that, in ascertaining the General Assembly's intent, we may presume that it intended "to favor the public interest as against any private interest." 1 Pa.C.S. § 1922(5). With these principles in mind, I address the statutory bases for relief asserted by Appellants and rejected, in turn, by the trial court and the majority.

Appellants contend that Appellees violated Act 6 by assessing certain foreclosure fees and costs in violation of section 406, which provides, in relevant part, as follows:

### § 406. Attorney's fees payable

With regard to residential mortgages, no **residential mortgage lender** shall contract for or receive attorney's fees from a residential mortgage debtor except as follows:

(1) Reasonable fees for services included in actual settlement costs.

(2) Upon commencement of foreclosure or other legal action with respect to a residential mortgage, attorney's fees which are reasonable and actually incurred by the residential mortgage lender may be charged to the residential mortgage debtor.

(3) Prior to commencement of foreclosure or other legal action attorneys' fees which are reasonable and actually incurred not in excess of fifty dollars ($50) provided that no attorneys' fees may be charged for legal expenses incurred prior to or during the thirty-day notice period provided in section 403 of this act.

41 P.S. § 406 (emphasis added). Appellants seek to recover under section 502 of Act 6, which provides that a person who has paid improper charges or excess interest "may recover triple the amount of such excess interest or charges in a suit at law against the **person** who has collected such excess interest or charges." 41 P.S. § 502 (emphasis added).

A "residential mortgage lender" is "any person who lends money or extends or grants credit and obtains a residential mortgage to assure payment of the debt. The term shall also include the holder at any time of a residential mortgage obligation." 41 P.S. § 101. The word "per-

son" refers to "an individual, corporation, business trust, estate trust, partnership or association or any other legal entity, and shall include but not be limited to residential mortgage lenders." *Id.*

As noted *supra*, the trial court dismissed Appellants' Act 6 claims because Appellees did not fit the definition of an RML. Because Appellants brought their claims under section 406, which by its terms proscribes certain conduct only by RMLs, and because Appellees are not RMLs, no claim against them could lie for a violation of section 406. The majority in effect adopts the trial court's reasoning in affirming that court's ruling. *See* Maj. Op. at 29–31.

Appellants argue that the trial court's ruling is in derogation of the plain language of Act 6 sections 101, 406, and 502. I agree.

Our Supreme Court recently observed in another connection that "[n]early all of the definitions under Section 101 [of Act 6] are defined in the context of mortgage loans." *Roethlein v. Portnoff Law Assocs., Ltd.,* — Pa. —, 81 A.3d 816, 822 (2013). Thus, among the chief abuses the legislature sought to remedy in that act, including those specified in article IV ("Protective Provisions"), were those associated with residential mortgage transactions. Indeed, virtually every section in article IV proscribes conduct specific to residential mortgage transactions. *See* 41 P.S. §§ 401–08.

Notably, article IV does not employ the word "persons" once in any of its provisions to refer to a lender, servicer, or debt collector. Although the word is employed elsewhere in the act to refer to an individual or entity other than a borrower, all

such uses, including its use in section 502, pertain to enforcement. *See* 41 P.S. §§ 502, *supra*, 505 (providing that "[a] ny person who ... violates [Act 6] shall be guilty of a misdemeanor of the third degree," and subject to a fine), 506 (providing for enforcement by the Attorney General against "any person" who has violated Act 6 or regulations promulgated thereunder). Stated briefly, Act 6's teeth are found in article V, which specifies the mechanisms for sanctioning violations of article IV's various prohibitions governing residential mortgage transactions, *inter alia.* If, as the majority holds, section 502 does not provide a remedy for violations of article IV generally and section 406 particularly, then it is unclear how a mortgagor is protected against the conduct proscribed therein in article IV when such conduct is undertaken by debt collectors or law firms that are serving at the behest of RMLs.

It cannot reasonably be disputed that, as the legislature surely was aware when it last amended Act 6 in 2008, *see* Act of July 8, 2008, P.L. 824, No. 57, § 1, RMLs, at least large institutional ones, sometimes delegate responsibility for collections to conventional debt collectors or to law firms serving in the hybrid role of debt collector and, when necessary, foreclosure counsel. In holding that the legislature intended to restrict section 406's prohibition solely to the misconduct of RMLs acting on their own behalf and never to their debt-collecting agents or delegates, the majority constructively grants RMLs carte blanche to flout section 406's strict limitations on the imposition of various costs on mortgage debtors simply by out-sourcing collection and foreclosure activities to third parties, law firms or otherwise.[5]

---

5. While Appellants may have other remedies against unscrupulous debt collectors or foreclosure counsel, given the majority's determi-

nation that UTPCPL claims cannot lie against foreclosure counsel, I am aware of no alternative statutory provision that multiples the

The General Assembly explicitly mentioned RMLs in its broad definition of "person," indicating its intent that RMLs, **among others,** could be subject to the various enforcement mechanisms embodied in article V. But the breadth of the definition of "person," read in the context of the word's almost exclusive usage in article V's enumeration of enforcement mechanisms, bespeaks the legislature's intent to broaden, not narrow, the group of "persons" subject to enforcement for violations of article IV. Having defined and strictly prohibited certain acts pertaining to the imposition and collection of legal fees associated with foreclosure, and having singled out such abuses for the enhanced award of treble damages, I believe that the legislature intended that **no one** associated with the violation of those provisions should be beyond the reach of Act 6 enforcement for the misconduct proscribed therein. The definition of "person," so broadly crafted, reinforces my belief in this regard.

My analysis is buttressed by another presumptively meaningful distinction between those sections: Section 406 prohibits the **receipt** of improper charges and interest, while section 502 prohibits the **collection** of such charges. This distinction further reinforces the inference that collection activity in violation of section 406, *i.e.,* collection activity affiliated with an RML's ultimate receipt of such charges, is prohibited, not just collection activity undertaken by the RML, itself. What it is improper for an RML to receive, it is improper for an RML's proxy to collect.

In my view, the majority's ruling moves the law incrementally toward a result not only at odds with Act 6's undisputedly remedial objective, but also one that is unreasonable if not absurd, allowing RML proxies to run roughshod over the rights and privileges provided to borrowers while hiding behind the fact that they are not, themselves, RMLs. And any RMLs who handle the process in-house now have notice that, to avoid article IV's provision, they need only adopt an out-sourcing model for collections. Everyone wins, except the mortgagors that article IV was designed to protect against specified abuses.

In effect, the majority interprets Act 6 to vest in residential borrowers a right not to be saddled with certain unreasonable interest rates and costs while denying them a remedy for that conduct when it is carried out by a lender's surrogates. However, Pennsylvania law long has rejected interpretations of the law that result in a right without a corresponding remedy. *See Carlacci v. Mazaleski,* 568 Pa. 471, 798 A.2d 186, 190–91 & n. 1 (2002) (holding that the right to reputation required an expungement remedy where none was created by statute); *Willcox v. Penn Mut. Life Ins. Co.,* 357 Pa. 581, 55 A.2d 521, 530–31 (1947) ("Not only is the maxim 'ubi jus ibi remedium'—where there is a right there is a remedy—one of the proudest declarations of the common law, but it necessarily implies that a right without a remedy is not a right at all but a mere abstraction."). Here, while there may be **some** alternative remedy, it is not

---

award for article IV misconduct by a factor of three, as section 502 provides, or that creates a direct avenue of relief against entities that, in whatever capacity, act on behalf of RMLs in ways that our legislature identified as improper in Act 6. An alternative remedy that is not equal to the escalated penalty imposed by our legislature in Act 6 disserves the legisla-

ture's overarching intent. As a remedial statute, Act 6 is designed to protect homeowners against certain misconduct, not just certain instances of certain misconduct when it happens to be perpetrated by one category of "person" as defined by section 502 but not another.

equal to the remedy provided by Act 6 for the abuses proscribed therein.

I believe that sections 101, 406, and 502, read in the context of each other and the larger statutory scheme, do not preclude an enforcement action under section 502 against any "person" complicit in violations of section 406, whether an RML or an agent thereof.[6] Consequently, I would hold that the trial court erred as a matter of law in holding to the contrary, and would reverse its order to the extent that it sustained Appellees' preliminary objections to Appellants' Act 6 claims.

Turning to the question whether Appellants can make out claims under the UTPCPL, I join the majority's analysis, subject to a caveat. Because I believe that the majority's brief analysis of *Beyers* is susceptible to an interpretation more broad than the Court's decision in that case warrants, I provide the discussion below to outline precisely the basis for, and the limitations of, my joinder in the majority's disposition of this issue.

In *Beyers, supra,* our Supreme Court considered "whether the [UTPCPL] applies to an attorney's conduct in collecting and distributing settlement proceeds." *Id.* at 1084 (plurality). Based upon her allegation of counsel's improper deductions from settlement proceeds, Beyers sued her attorney for, *inter alia,* alleged violations of the UTPCPL. *Id.* at 1085. The trial court found the attorney liable under the UTPCPL and awarded treble damages. On appeal, this Court affirmed the trial court's award of damages under the UTPCPL, holding that the attorney's misconduct did not arise from the practice of law, and that the attorney could not use

his professional status as a shield against an otherwise valid UTPCPL claim. *Id.*

Our Supreme Court granted allowance of appeal, and reversed. In the lead opinion, only limited aspects of which commanded a majority, a plurality of the Court noted that a majority of jurisdictions had held that attorney misconduct is not subject to consumer protection laws. *Id.* at 1086 & n. 7 (citing cases). However, a minority of jurisdictions carved out exceptions for "the entrepreneurial aspects of the practice of law, such as advertising and debt collection," while proscribing liability under consumer protection laws for negligence and legal malpractice. *Id.* at 1086 and n. 8 (citing cases), *see id.* at 1087 n. 12 (citing cases in which courts had **implied** "that in certain circumstances a claim could be brought against an attorney under the consumer protection act").

Noting that the question presented was novel in Pennsylvania, our Supreme Court observed that we "ha[ve] held that the UTPCPL does not apply to treatment provided by another category of professionals: physicians." *Id.* at 1087 (citing *Foflygen v. Zemel,* 420 Pa.Super. 18, 615 A.2d 1345 (1992); *Gatten v. Merzi,* 397 Pa.Super. 148, 579 A.2d 974 (1990)). The Court deemed persuasive the consonant conclusion of the United States District Court for the Eastern District of Pennsylvania in *Jackson v. Ferrera,* No. Civ.A. 01–5365, 2002 WL 32348328 (E.D.Pa.2002), an unpublished decision rejecting the application of the UTPCPL "to attorney conduct in the practice of law." *Id.* at 1089.

The Court further acknowledged the district court's conclusion in another unpublished decision that attorneys "who

---

6. Moreover, to the extent my reading of the relevant provisions and that of the trial court and the majority reflect any ambiguity, in the context of a remedial statute such as Act 6 we must construe the statute broadly to effectu-

ate its remedial ends. *See Creamer,* 329 A.2d at 816. This leads to the same result that I believe is necessitated by the statute's plain language.

regularly engage in debt collection practices, *apart from their legal representation,*" are subject to liability under the FDCPA. *Id.* (quoting *Daniels v. Baritz,* No. 02–cv–7929, 2003 WL 21027238, at \*4, emphasis added by the Supreme Court).[7] The *Daniels* court found that the UTPCPL "appl[ied] to debt collection as an act in trade or commerce." *Id.* (citing *Daniels,* 2003 WL 21027238, at \*5). The Supreme Court also acknowledged our Commonwealth Court's holding that the UTPCPL applies to a physician's fraudulent activity in seeking to collect debts from his patients, *id.* (citing *Commonwealth v. Cole,* 709 A.2d 994 (Pa.Cmwlth. 1998)), notwithstanding that claims arising out of the practice of medicine are excluded from UTPCPL liability. However, the *Beyers* Court found that these various circumstances were distinguishable from UTPCPL claims based upon "professional misconduct," undisputedly the character of claims presented in *Beyers. Id.* In distinguishing rather than rejecting these cases, the Court neither expressed nor implied any disapproval of those decisions in their respective contexts.

In tandem with its review of various Pennsylvania constitutional provisions bearing upon the regulation of attorneys, a broad analysis that did not command a majority of the Court, the plurality posited that Pennsylvania's rules of professional conduct and of disciplinary enforcement "exclusively address[ed] the conduct complained of" **in that case.** *Id.* at 1092 (citing, *inter alia,* Pa.R.P.C. 1.5(c), 1.15(b); quoting Pa.R.P.C. 8.4(b)). Carefully confining its holding to the facts then at bar, the Court concluded that attorneys' "**con-**

**duct in collecting and distributing settlement proceeds** does not fall within the purview of the UTPCPL." *Id.* at 1093 (emphasis added).

In his concurring opinion, which was joined by Justice Baer, then-Chief Justice Cappy emphasized that he "agree[d] with the majority, to the extent that it holds that[,] as a matter of statutory construction, the [UTPCPL] does not apply to attorneys practicing law." *Id.* at 1093 (Cappy, C.J., concurring). The concurrence expressly disavowed the plurality's discussion of Pennsylvania constitutional provisions regarding the proper repository for the oversight of attorneys, and did not rely upon the ethical rules cited by the plurality. *Id.* In effect, the narrow *Beyers* consensus was limited to the plurality's reliance upon the interpretive rationales that were ventured by this Court in *Walter* and the district court in *Jackson.* In *Walter,* as read by the *Beyers* plurality, we held that the UTPCPL's focus on protecting against "unfair methods of competition and deceptive practices in the conduct of any trade or commerce" excluded the activities of physicians rendering medical services to their patients. *See Beyers,* 937 A.2d at 1088 (quoting *Walter,* 876 A.2d at 407–08). In *Jackson,* as in *Beyers,* the attorney who was deemed immune from UTPCPL liability was sued by his clients for misconduct in connection with his representation of **those clients,** an action subject separately to professional malpractice liability, not liability arising from misconduct toward a party outside the attorney-client relationship, who would have no direct malpractice remedy.[8] *See Beyers,* 937

---

**7.** In *Yelin v. Swartz,* the same district court extended the analysis to Pennsylvania's FCEUA. 790 F.Supp.2d 331, 338 (E.D.Pa. 2011) ("If the complaint does not allege that the defendant committed misconduct during the course of practicing law, the mere fact

that the defendant happens to be an attorney will not bar a UTPCPL claim.").

**8.** This point warrants emphasis: Neither abused clients nor abused third parties benefit directly from administrative remedies arising

A.2d at 1088–89 (citing *Jackson*, 2002 WL 32348328, at *4).

In distinguishing *Daniels* and *Cole*, cases involving, respectively, "[a]ttorneys who regularly engage in debt collection practices, *apart from their legal representation*," *Beyers*, 937 A.2d at 1089 (quoting *Daniels*, 2003 WL 21027238, at *4 (emphasis supplied by *Beyers* )), and a physician seeking to collect debts from his patients, *id.* (citing *Cole*, 709 A.2d at 997), the *Beyers* Court necessarily left open the prospect of UTPCPL claims against attorneys acting outside the scope of their professional practices, including in the context of debt collection on behalf of a client against a third party. Were we to find that the third-party debtors' UTPCPL claims against attorneys acting as debt collectors did **not** involve the practice of law, we would be writing on a blank slate, at least relative to Pennsylvania law. However, because of the way Appellants presented their claims, we need not do so in this case.

As noted, the trial court based its ruling primarily upon the fact that Glover's complaint asserted that the misconduct for which UTPCPL relief was warranted occurred in connection with Udren's foreclosure complaint. Thus, by Appellants' own lights, any misconduct was committed by Appellees in the context of the practice of law. Even in carefully restricting its ruling to the facts then at bar, a majority of the *Beyers* Court held that misconduct associated with the practice of law does not fall within the purview of the UTPCPL based solely on its reading of the text of the UTPCPL. Thus, *Beyers* controls Glo-

ver's case and supports the trial court's ruling dismissing Glover's UTPCPL claims. However, had Appellants asserted improprieties outside the context of the foreclosure complaint itself, I believe it remains unclear whether UTPCPL claims would lie. *Beyers* left the question unresolved, and it is unnecessary and therefore imprudent to resolve it in this case. Thus, I do not read *Beyers* or the majority's opinion to hold or suggest that a licensed attorney acting as a debt collector or in another capacity unrelated to the practice of law cannot be held liable under the UTPCPL.[9] That question must wait for another day.

In closing, I must acknowledge a lurking difficulty, in that my analyses of these two issues, and the results I would reach, may appear at first blush to be in tension with each other. Appellants' Act 6 and UTPCPL claims arise from the same underlying misconduct, yet I would reach different results as to each. However, nothing in our canons of statutory construction so much as suggests that acts excluded from liability under one statute cannot create liability under another statute. Despite their occasional complementary interactions, Act 6 and the UTPCPL provided distinct remedies for distinct categories of misconduct. While the UTPCPL proscribes fraud and deceit in commerce, Act 6 proscribes, *inter alia*, the imposition, collection, and receipt of excessive or prohibited fees and interest arising in the context of residential mortgages. *Cf. Penna. Dep't of Banking v. NCAS of Del., LLC*, 995 A.2d 422, 442 & n. 25 (Pa.Cmwlth.2010) (distinguishing Act 6

---

from the Supreme Court's oversight of the practice of law. Clients, however, have recourse to malpractice actions, while third-party remedies are fewer and far between. Indeed, in this regard, physician cases arguably bear little resemblance to attorney cases, inasmuch as the rendering of clinical care to

one party seldom, if ever, entails injuring a third party. The same cannot be said of the rendering of legal services.

9. I do not mean to suggest that the majority intends otherwise. But its brief allusion to *Beyers* in its brevity might be read that way.

from the UTPCPL because Act 6 does not have "as its primary aim the prevention of fraud or deceit"; rather, Act 6 aims to "protect consumers from paying too much interest").

Absent a clear basis for departing from our obligation to honor Act 6's plain language—and no such basis has been ventured—I would read Act 6 as a self-contained set of rules and remedies that are in no way informed by the distinct protections, remedies, and exclusions found in the UTPCPL or the FCEUA. As set forth above, it is unnecessary to depart from Act 6's plain language, viewed in light of its own definitions, the broader statutory context, and its remedial function, to hold that Appellants' Act 6 claims cannot be jettisoned on preliminary objections under the circumstances of this case.